746 So.2d 817 (1999)
CONSTRUCTION AND ENVIRONMENTAL MANAGEMENT, LLC, and Jerry Conrad and Judith Conrad
v.
R & R LANDHOLDING, LLC, Regatta Investment Group, LLC, Stephen Bandi, Allene Shane, Michael Reed and Darlene Reed, and CSAH Limited Partnership
No. 99-CA-157.
Court of Appeal of Louisiana, Fifth Circuit.
November 10, 1999.
Rehearing Denied December 6, 1999.
Writ Denied February 18, 2000.
*818 Philip A. Franco, Sean D. Moore, Adams and Reese, LLP, New Orleans, for Plaintiff/Appellee, Cross-Appellant Construction and Environmental Management, LLC.
Terrence L. Brennan, Charles F. Seemann, Jr., Isaac H. Ryan, Deutsch, Kerrigan & Stiles, New Orleans, for Defendant/Appellant R & R Landholding, LLC.
Panel composed of Judges EDWARD A. DUFRESNE, Jr., SOL GOTHARD and THOMAS F. DALEY.
GOTHARD, J.
Construction and Environmental Management, LLC, (CEM) has sued R & R Landholding, LLC, Regatta Investment Group, LLC, and CSAH Limited Partnership (CSAH), for breach of contract and other causes. After trial on the merits, the court rendered judgment in favor of plaintiff and against defendants for $263,955.00. Pursuant to a motion for new trial, the judgment was modified to reduce the award to plaintiff to $163,955.00. Both R & R Landholding, LLC, and Construction and Environmental Management, LLC, have appealed. For the following *819 reasons, we affirm the judgment of the trial court.

FACTS
R & R Landholding, LLC ("R & R") was formed by Darlene and Michael Reed, in late 1994, for the purpose of purchasing and renovating the Canterbury Square Apartments, located in East Baton Rouge. At its inception, the Reeds owned a 50% interest each in R & R. In December of 1994, drawings and specifications for the renovations were drafted by James Dobbs, A.I.A., an architect with the firm of Architectural Studio.
R & R approached several banks in an attempt to secure financing for the renovation project. In mid-1995, R & R approached Gulf Coast Commercial Mortgage Company ("GCCM"), through its president Stephen Bandi. (Bandi owned 50% of GCCM and Gulf Coast Bank and Trust owned the remaining 50%.) In June of 1995, Bandi prepared a loan application directed to Gulf Coast Bank and Trust. The application for a loan was denied, at which time Bandi suggested that R & R get additional partners for more financial strength.
In August of 1995, Bandi and Allene Shane (Bandi's mother-in-law) formed Regatta Investment Group, LLC (Regatta); Ms. Shane owned 60% and Bandi owned 40%. Bandi was designated managing member of Regatta. Regatta then became a 50% owner in R & R. In consideration, Regatta contributed capital equal to that contributed by R & R, and it was agreed that Construction and Environmental Management, LLC (CEM) would oversee and act as the general contractor for the renovation project.
Prior to involvement with R & R, CEM was owned 100% by Jerry Conrad and his wife, Judith Conrad. As partial consideration for the award of the renovation contract, 50% of the ownership interest in CEM was transferred to Regatta, with Jerry Conrad remaining the only managing partner. (This was accomplished in October of 1995.)
Regatta's proposal of August 4, 1995 submitted to R & R, in the form of a letter, disclosed to R & R that Bandi has ownership interest in both Regatta and CEM:
AHI/CEM, a firm related to both GCCM and Regatta by partial common ownership (i.e. Stephen J. Bandi), would oversee and act as the general contractor for the renovation project. A contract for construction would be executed by and between AHI/CEM and R & R.
This letter was signed by both Michael and Darlene Reed. At trial, Bandi testified that all parties knew of his ownership interests in Regatta, R & R and CEM throughout the entire project. However, the Reeds testified that they were unaware of the extent of and/or the fact of Bandi's ownership interests in the various entities.
In September of 1995, R & R, through GCCM, obtained construction financing in the amount of $2.3 million, to be provided in two phases of $1,350,000 and $950,000 respectively.
CEM was provided with a copy of the drawings and specifications prepared by the architect. In October of 1995, Mike Reed, Jerry Conrad and Bandi negotiated the terms and price of the construction contract, "based on the plans and specifications... includ[ing] changes and alterations as discussed by all parties involved in the project." Completion times and other terms were also negotiated. Although a written contract was drafted, no written contract was ever executed by the parties. At the trial, the parties agreed that the contract for renovations was for a guaranteed maximum amount of $2.69 million.
Work on the project started in November of 1995. Testimony at trial reflected that the drawings and specifications drafted by James Dobbs (which were not very detailed) were the plans used for the construction. Bandi testified that the scope of *820 the work to be performed changed soon after commencement of the project. For example, the original scope of work provided for five different categories for renovation; however, ultimately it was decided to gut and totally renovate all the units in the complex. In addition, there were changes to the electrical plans and plumbing in order to bring the buildings to code, as well as other changes. No change orders were written at the time the decision to make these changes occurred.
The project went over budget by over $300,000.00, allegedly as a result of four oral change orders, made by Conrad, acting for CEM, and approved by Bandi, acting for R & R. Bandi also testified that his secretary was instructed to send copies of each of these invoices to the Reeds. The cost of these change orders were reflected in invoices provided by CEM, as follows: On February 29, 1996, CEM submitted an invoice which reflected an increase in the guaranteed maximum amount of $85,820.00. An invoice dated May 6, 1996, reflected a second change in price of $196,190.00. The third change, in the amount of $41,695.00, was reflected by an invoice submitted by CEM on July 24, 1996. The fourth change, reflecting an increase of $70,300.00, was submitted on February 5, 1997.
Bandi testified that he was the managing member of R & R. There were never any formal votes taken, nor were there any minutes of meetings held. The members of R & R talked with each other, either face to face or on the phone several times a week. Bandi admitted that the operating agreement of R & R did not give him the authority to act as a manager, but he testified that he was given the authority by the Reeds, and that he was never told by the Reeds that he did not have authority to act for R & R. Bandi further testified that R & R did not pay the full amount of each draw to CEM because of cash flow problems.
Conrad testified that there was no agreement that change orders had to be in writing. He stated that he believed Bandi was the managing member of R & R. He further stated that he was never told that he had to obtain the approval for the invoices from Michael and Darlene Reed, instead of, or in addition to, Stephen Bandi.
Bandi testified that there was no time schedule set for the work on the project. Although the original target date for completion was the latter part of the summer of 1996, the schedules continually changed as the scope of the job changed. Conrad also testified that there was no agreement on a completion date for the project.
Darlene Reed testified that Bandi was not the managing member of R & R, and that all decisions required either an oral or written majority vote of all the members. She stated that Bandi was not authorized to approve change orders without the other members. Michael Reed also testified that all decisions affecting R & R required a majority vote. He admitted that decisions on the "day-to-day" activities of the project were left to Bandi.
In May of 1996, Darlene Reed took over as on site supervisor for the project. She remained supervisor until October of 1996. During that time, she increased the number of workers and subcontractors to speed up the project, causing the payroll budget to increase. Bandi testified that during this time period, Ms. Reed was well aware of the changes in the project, as she was on the job site daily. Also, Reed frequented the job site and he too was aware of the changes. Darlene Reed stated that she never approved any change orders and was not aware that the budget exceeded the original price until December of 1996, after she left the job site.
Michael Reed testified that he did not tell CEM (Conrad) that his approval was needed for change orders. He admitted that he made no objections to CEM until December of 1996. He also admitted that Darlene Reed was supervisor on the job from May to October. He further stated *821 that he let Bandi handle all the invoices and draw requests.
He testified that he received the change order analysis in January of 1997. Before the lawsuit was filed, he did not know that Bandi was a 50% owner of CEM. At the time of trial, R & R had paid everyone involved in the construction except CEM. Reed further stated that Bandi was never a managing member, nor did he have the authority to bind R & R to cost increases.
Also in May, CEM borrowed $100,000 from Gulf Coast Bank and Trust, which was used to support CEM's cash position with regard to the project. R & R was guarantor on the loan.
In June of 1996, R & R syndicated its tax credits to First National Bank of Commerce and City National Bank. CSAH Limited Partnership ("CSAH") was formed, with the banks owning 99% and R & R owning the remaining 1%. Title to the complex was transferred from R & R to CSAH. CSAH articles prohibited the managing partner from changing the scope of the job, or incurring additional charges without approval of all the members. Bandi testified that although the invoices documenting two of the change orders were submitted after the transfer to CSAH, the actual change orders were made orally before that time, and on the job site. Bandi admitted that he never received authority from the CSAH owners to change the scope of the work after June of 1996.
In October of 1996, Regatta transferred its interest in CEM to Stephen Bandi, and the CEM operating agreement was amended to substitute Bandi for Regatta as a 50% owner.
In early January 1997, CEM stopped work on the project. Conrad testified that work stopped because of lack of funds. At that time, he believed that CEM would return to the job site when the funds became available. Michael Reed testified that he did not intend for CEM to finish the project.
At trial Robert Picou testified that at the time of the renovation project, he was employed by Standard Enterprises, the company hired to manage the apartment complex. Standard was responsible for leasing the apartments, managing the apartments and taking care of residents' problems. The first apartment was leased in March of 1996. From that point on, there were always apartments available for leasing. The apartment complex did not lease to LSU students because there were certain criteria to be met in order for the owners to obtain tax credits, and the students did not meet those criteria.
At the trial of this matter, the parties stipulated that CEM incurred expenses of $3,129,888. The parties further stipulated that R & R paid $2,678,708 directly to CEM and $174,219 to CEM's subcontractors and materialmen.
R & R contended at trial that: 1) any change orders to the original fixed price contract were required to be in writing, and therefore the oral change orders, causing the increase in contract price, were invalid; 2) even if the change orders were not required to be in writing, Bandi did not have the authority to execute these change orders on behalf of R & R; and, 3) the expenses requested by CEM were cost overruns, and not changes to the scope of the work.
After trial on the merits, the trial court rendered judgment in favor of CEM, stating that:
... But I'm faced with a situation where the plaintiff alleges costs incurred of three million one hundred and twenty nine thousand eight hundred and eighty four dollars. And there's been a stipulation that the defendant paid two million eight hundred and fifty two thousand nine hundred and twenty eight dollars, which leaves and amount due of three hundred and eight thousand nine hundred and fifty five dollars.
The first amount that I'm going to reduce that by is $32,000.00, because *822 that is the alleged loan activity that Mr. Bandi participated in. And although it is myit [is] the decision of this Court that Mr. Bandi had authorization, even though he wore many different hats in this program by representing himself as an owner, representing himself as a contractor. It is my opinion that he had the authorization to make what I believe the evidence supports to be change orders. However, Mr. Bandi did not have the authorization to obligate the defendants, R & R and CSAH, by an amount of $32,000.00.
So, it's the judgment of this Court that the defendants are indebted to the plaintiff in the amount of $276,955.00 less $11,000.00, which are claims made by the defendants, and I believe to be substantiated. And it is further reduced by $2,000.00, which is the value placed by Mr. Conrad on the tools that were charged against this job, which I classify as small tools, and believe that they should not have properly been incurred. And that leaves a net judgment in favor of the plaintiff of $263,955.00.
The dilemma that I've been faced with in this matter and that I have expressed during the trial is that I have a contractand I say that in quotes, a contract that is not signed, without completion dates. There are plans and specifications that are either incomplete or don't represent the final construction. There are spreadsheets that allegedly are tied into the case, but not titled, not dated, not signed by anyone. I painfully render a judgment in favor of the plaintiff, because I just think Mr. Bandi really duped everybody.
But, I think I have to look beyond that and still decide the case based on the authorizations of Mr. Bandi authorizing the change orders to be made by the plaintiff construction company in this case.
Defendants filed a motion for new trial on this issue of whether they were entitled to an offset and credit of the $100,000.00 Gulf Coast Bank loan. The trial court granted the motion for new trial, found that CEM received the proceeds of the $100,000.00 loan and was therefore entitled to an offset. The court then modified the judgment of November 26, 1997 to award to plaintiffs the amount of $163,955.00.

ISSUES ON APPEAL
In its appeal, R & R presents the following assignments of error:
1. The trial court erred in determining that neither the written contract between CEM and R & R or the drawings and specifications prepared by the Architectural Studio required all changes to be made in writing.
2. The trial court erred in failing to hold that La. R.S. 12:1318C invalidated Steve Bandi's modifications to the construction contract on behalf of R & R.
3. The trial court erred in determining that Steve Bandi was authorized to modify the construction contract under either the R & R Operating Agreement or the CSAH Partnership Agreement.
4. The trial court erred in determining that Steve Bandi had "apparent authority" to modify the construction contract on behalf of R & R or CSAH.
5. The trial court erred in determining that all expenses alleged by CEM were required by changes in the scope of the work, rather than cost overruns caused by CEM's failure to properly budget the project and CEM's poor management of the project.
6. The trial court erred in failing to award R & R damages for CEM's failure to timely complete the project.
CEM also appealed, alleging that, "The trial court erred in giving credit to R & R for payments of $25,000.00 that were applied to loans against the amount owed for work on the project, and in giving R & R credit for the $100,000.00 Gulf Coast loan."

*823 ANALYSIS

Our Supreme Court recently restated the standard of factual review on appeal in Syrie v. Schilhab, 96-1027 (La.5/20/97), 693 So.2d 1173, page 1176:
A court of appeal may not set aside a trial court's finding of fact in the absence of "manifest error" or unless it is "clearly wrong." This court has announced a two-part test for the reversal of the factfinder's determinations: (1) the appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and (2) the appellate court must further determine that the record establishes that the finding is clearly wrong (manifestly erroneous). The issue to be resolved by the reviewing court is not whether the trier of fact is right or wrong but whether the factfinder's conclusion was a reasonable one. Where the testimony of expert witnesses differ, it is the responsibility of the trier of fact to determine which evidence is the most credible. The reviewing court must always keep in mind that if the trial court's findings are reasonable in light of the record reviewed its entirety, the court of appeal may not reverse, even if convinced that had it been sitting as trier of fact, it would have weighed the evidence differently. (Citations omitted).
In its first allegation of error, R & R alleges that the trial court erred in failing to find that the change orders were required to be in writing.
R & R points to the written, but unsigned, contract and the specifications prepared by James Dobbs, both which state that change orders must be in writing, to support its allegation of error. However, there was testimony at trial that these documents were not the contract between the parties. Instead the parties had an oral agreement that underwent several oral modifications, and that the scope of the agreement changed from day one of the project. In finding that the change orders were valid, the trial court implicitly found that the change orders did not need to be in writing. We cannot say, based on the record before us, that this finding was in error.
R & R next alleges that La. R.S. 12:1318C nullifies Bandi's execution of the change orders. La. R.S. 12:1318C provides that:
No contract or transaction between a limited liability company and one or more of its members, if management is reserved to the members, or managers, if management is vested in one or more managers pursuant to R.S. 12:1312, or a person in which such a member or manager has a financial interest, shall be void or voidable solely for this reason, solely because the interested member or manager was present at or participated in the meeting which authorized the contract or transaction, or solely because his or their votes were counted for such purpose, if the material facts as to his interest and to the contract or transaction was disclosed or known to the members and the contract or transaction was approved by a majority vote of the members without counting the vote of the interested member, or if the contract or transaction was fair to the limited liability company as of the time it was authorized, approved, or ratified by the members. Interested members may be counted in determining the presence of a quorum at a meeting which authorized the contract or transaction.
R & R argues that this article operates to invalidate the change orders made between R & R and CEM. We find that R.S. 12:1318C is inapplicable to the instant case. The contract at issue is not between the corporation, (R & R) and its managing member (Regatta or Mr. Bandi), nor is the contract at issue between CEM and its managing member (Regatta or Bandi). Instead the contract sought to be invalidated is between R & R and CEM.
*824 There may be breach of fiduciary claims which could be alleged against a limited liability corporation by its managing member. There are no such claims in this instant suit and no such claims before this court. Compare, Dunbar v. Williams, 554 So.2d 56 (La.App. 4 Cir.1988). We find this allegation to be without merit.
In its next two allegations of error, R & R alleges that the trial court erred in finding that Bandi had actual and/or apparent authority to execute the change orders modifying the contract.
R & R alleges that its operating agreement, which requires a majority vote of the members, prevented Bandi from approving the change orders without the majority vote of the R & R membership.
The evidence at trial reflected the scope of the job changed during the course of the construction. Both Michael and Darlene Reed were frequently on the job site, and did not object to the work performed. In fact, Darlene Reed was the job supervisor for approximately six months. While the operating agreement called for a majority vote, there were no such votes taken at any time. There were no meetings held, and no recorded minutes. Michael Reed himself testified that he left the decisions concerning the construction project to Bandi. We do not find that the trial court was clearly wrong in ruling that Bandi had the authority to approve the change orders at issue.
R & R next contends that the trial court erred in finding that the amount in excess of the contract was incurred as a result of change orders, instead of finding that the majority of the extra costs claimed were budgetary allocations and cost overruns. However, the trial court found that the amounts incurred over the initial contract price were incurred as a result of change orders. After reviewing the evidence in this case, we cannot say that the trial court was manifestly erroneous in this determination.
Lastly, R & R alleges that the trial court erred in failing to award damages for delay. In its brief it argues that, had the individual apartments been renovated more timely, they would have been leased and would have generated more cash flow.
The testimony established that there was no set date for completion of the renovations. For a good part of the time that the renovations were in progress, Ms. Reed was the job supervisor and the renovations were proceeding timely. In addition, testimony established that at no time did the apartment complex lack renovated apartments for rent, on the contrary there were available renovated units. We can see no abuse of discretion in the trial court's failure to award delay damages.
In its cross-appeal, CEM argues that the trial court erred in granting an offset to R & R.
The trial court found that, although Bandi had the authority to approve the change orders, which were a part of the ongoing construction, he did not have the authority to obligate R & R to a $32,000.00 loan without permission of R & R. While Michael Reed's testimony established that the decisions regarding the construction were left up to Bandi, there was no testimony, other than Bandi's himself, to find that decisions regarding financial obligations were delegated to him also. There does not appear to be manifest error in the trial court's finding that Bandi did not have the authority to incur financial obligations.
The trial court, on motion for new trial, also gave R & R credit for $100,000.00, based on the fact that CEM received the proceeds of a loan that it incurred, on which R & R was guarantor. We see no error in the trial court's decision. CEM argues that although it received the proceeds of the loan, it is also obligated to pay back the loan. However, we hold that the trial court's decision granting credit to R & R for the loan discharges CEM from any further liability *825 for payment of the loan. Since CEM is not liable for payment of the loan, there is no error in granting R & R credit for the proceeds of the loan.

CONCLUSION
For the above discussed reasons, we affirm the decision of the trial court. All costs of this appeal are assessed against appellants.
AFFIRMED.